JOSEPH C. MANN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; JOSEPH C. MANN and SHIRLEY V. MANN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Mann v. Commissioner
Docket Nos. 11056-79, 11057-79.
United States Tax Court
T.C. Memo 1981-684; 1981 Tax Ct. Memo LEXIS 63; 42 T.C.M. (CCH) 1766; T.C.M. (RIA) 81684; November 25, 1981. Ronald *65 Lee Gilman, for the petitioners. Cynthia M. Odle-Schlechty, for the respondent. FAY
MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: Respondent determined the following deficiencies in petitioners' Federal income taxes: Petitioner(s)
Taxable Year
Deficiency
Joseph C. Mann
1974
$ 26,923.52
Joseph C. Mann and
1975
197.67
Shirley V. Mann
These cases have been consolidated for purposes of trial, briefing, and opinion. Some of the facts have been stipulated and are found accordingly. Petitioners' address at the time of filing the petitions herein was Collierville, Tenn. After concessions, the following issues remain for our determination: (1) the correct amount of gross receipts from Joseph C. Mann's (hereinafter petitioner) business for 1974, (2) whether petitioner incurred a short-term capital loss or an ordinary loss in 1974 with respect to a $ 10,200 payment made to start a grocery store business, (3) the extent to which certain Master Charge expenses are deductible in 1974 and 1975, (4) the extent to which two automobiles were used in petitioner's business, and (5) whether petitioners are entitled to a deduction *66 for theft loss in 1975 due to embezzlement of business funds. Issue 1. Gross Receipts
FINDINGS OF FACT Petitioner started his own construction business in 1964 and has since built his business into a very profitable operation. By 1974 petitioner's business mainly involved contracting for the concrete work in the construction of new apartment buildings. Petitioner considered himself one of the largest concrete contractors in Shelby County, Tenn., which includes Memphis. In 1974, petitioner did the concrete work for several major projects which included anywhere from 15 to 40 buildings per project. The contract price per project ranged from $ 60,000 to $ 150,000. Petitioner, at various times during 1974, had 20 to 50 employees on his payroll. Petitioner's business also included the rental of heavy equipment. The books of petitioner's business were kept by Fay Miller (Miller). A ledger of the business' income account, which was prepared by Miller, showed gross receipts from business operations of $ 656,535.64 in 1974. The ledger contained monthly credits which recorded business receipts for each month. At the end of the 12-month period ending December 31, 1974, four *67 adjustments in the ledger were recorded. Two of those yearend adjustments, nos. 16 and 18, reduced the business' gross receipts by debiting to the income account the amounts of $ 25,823.20 and $ 300.00, respectively. The two remaining yearend adjustments, nos. 4 and 5, increased the business' gross receipts by crediting to the income account the amounts of $ 3,650.00 and $ 54,146.53, respectively. Miller used a double entry system of accounting in preparing the ledger, which was kept in the normal course of her employment as petitioner's bookkeeper. All records of petitioner's business were available for the audit of his 1974 and 1975 income tax returns. Those audit proceedings were completed prior to February 1979 when a fire destroyed many of those records, including all records with respect to the composition of the above adjustments. Petitioner was represented by Robert W. Knapp (Knapp), a Certified Public Accountant (CPA), at those audit proceedings. Knapp personally inspected petitioner's books and examined the records substantiating adjustment no. 16. He concluded that petitioner's books were kept properly and that this yearend adjustment, reflecting non-income items, *68 was proper. In his notice of deficiency, respondent determined that the yearend adjustment no. 16, which debited (decreased) the business' gross receipts by $ 25,823.20, represented unreported gross income in 1974. OPINION The issue is the propriety of an accounting entry which reduced 1974 gross receipts from petitioner's construction business. The burden of proof is on petitioner to overcome the presumption of correctness that attaches to respondent's determination. Welch v. Helvering, 290 U.S. 111 (1933). Respondent contends that adjustment no. 16 which reduced petitioner's business gross receipts by $ 25,823.20 represents a deliberate understatement of gross receipts by petitioner. As such respondent asserts that petitioner's 1974 gross income from his business was $ 682,358.84 rather than the $ 656,535.64 amount reported by petitioner. In the alternative, respondent contends that adjustment no. 16 represents an improper reclassification of unsubstantiated expense items by debiting such items to the income account. Petitioner asserts that this accounting *69 entry is a yearend adjustment which represents non-income items, and gross receipts were correctly reported as $ 656,535.64. Petitioner's books were kept by Fay Miller in the normal course of her employment as petitioner's bookkeeper. Miller used a double entry system of accounting whereby each debit was balanced by a corresponding credit to a separate account. There is no indication whatsoever that the method of bookkeeping used by Miller was anything but proper. Indeed, Knapp, petitioner's CPA, who became familiar with petitioner's method of bookkeeping and who personally examined the records backing up adjustment no. 16, concluded petitioner's books were kept properly and that adjustment no. 16 was a proper adjustment. During the year, petitioner's bookkeeper credited to income certain receipts of unknown character. Some of those receipts represented non-income items such as transfers between business and personal accounts, bank loans, reimbursed downpayments made on contract bids, and insurance repayments. At the end of the year, adjustment no. 16 to income was necessary to properly reflect the non-income nature of those receipts. The adjusting entry in question did *70 not appear alone on petitioner's income ledger. Three other yearend adjustments were made on that same income ledger. Among those adjustments, two such entries increased petitioner's gross receipts by a total of $ 57,796.83. Those entries were not questioned by respondent. Petitioner's CPA, Knapp, was a perfectly credible witness. He personally examined petitioner's books before their destruction and he concluded those books were in proper order. We are convinced that the adjusting entry of $ 25,823.20 represents neither unreported income nor a reclassification of unsubstantiated business expenses, as claimed by respondent. We find that that adjustment represents a proper bookkeeping entry reflecting non-income items which had previously been credited to the income account, and petitioner correctly reported 1974 gross receipts as $ 656,535.64. Issue 2. Grocery Store Loss
FINDINGS OF FACT In 1974 petitioner advanced $ 10,200 to Gerald Hendricks (Hendricks) to open and stock a small grocery store. The understanding between petitioner and Hendricks was that, after petitioner recovered his $ 10,200, they were to split the profits from the store equally. Petitioner advanced *71 all the money, and Hendricks operated the grocery store. A small one room store was rented to operate the grocery business. After only a couple months of operation, Hendricks locked up the store and left town, taking all the remaining cash. Petitioner later received a post card from Hendricks who was enjoying himself in Reno, Nev.
Petitioner deducted the entire $ 10,200 as an ordinary loss on his 1974 Federal income tax return. In his notice of deficiency, respondent determined that the $ 10,200 loss deducted by petitioner in 1974 is short-term capital loss. OPINION The issue is whether petitioner recognized short-term capital loss or ordinary loss. Neither the fact that petitioner sustained a loss nor the amount of such loss is in dispute. Respondent maintains that petitioner sustained a capital loss under section 741 [1] because such loss was the result of a sale or exchange of a partnership interest. Petitioner maintains he sustained a bad debt loss resulting in ordinary loss. We are not in complete agreement with either party. *72 We do agree with respondent that the understanding between petitioner and Hendricks created a partnership. For this reason we find petitioner's contention that he sustained a bad debt loss, without merit. There was no loan to Hendricks. Petitioner advanced the money as a contribution to partnership capital. No debtor-creditor relationship existed which would support a bad debt claim. Sec. 1.166-1(c), Income Tax Regs.
Respondent contends that the entire loss should be accorded capital treatment since such loss is the result of a disposition of a partnership interest. We cannot fully agree with respondent that the entire loss is capital in nature.
Section 702(a) requires a partner to take into account, in his individual return, his distributive share of partnership loss. A partner takes into account as an ordinary loss his distributive share of partnership loss occasioned by a partner's embezzlement of cash. Sec. 165(a) and (c)(1). [2]
Although petitioner came forward with no evidence showing *73 the precise amount of cash which was stolen by Hendricks, we know Hendricks did abscond with some cash. Petitioner advanced $ 10,200 to Hendricks. A part of this amount was expended to open a small one room grocery store. Hendricks rented and operated the store a very short period of time. Hendricks surely had a substantial amount of cash left over, at least enough to pay for a vacation in Reno, Nev. Applying the Cohan rule, we find that $ 5,000 fairly represents the amount of cash Hendricks embezzled. See Cohan v. Commissioner, 39 F.2d 540, 544 (2d Cir. 1930). Since his distributive share is 100 percent, petitioner is entitled to an ordinary loss of $ 5,000. With regard to the remaining $ 5,200 contributed to partnership capital and never recovered by petitioner, we must accord capital loss treatment. There are a number of ways a partner can recognize capital loss through his ownership of a partnership interest. We know a partnership existed and operated for a period of time. However, we are given no account of any partnership operations, which may have included capital transactions. We are given no information regarding the disposition of the remaining *74 assets of the partnership. Furthermore, we lack information regarding any partnership liabilities outstanding at the termination of such partnership which may give rise to capital loss on liquidation of a partner's interest. See secs. 752(b), 731(a), 741. The burden of proof is on petitioner to overcome the presumption of correctness which attaches to respondent's determination. Welch v. Helvering, 290 U.S. 111 (1933). Petitioner has simply failed to meet his burden of proof that his remaining basis is recoverable as ordinary loss rather than, as respondent contends, capital loss. In summary, we hold that the $ 5,000, which fairly represents the amount embezzled by Hendricks, is recoverable by petitioner as ordinary loss. However, the remainder of petitioner's loss, $ 5,200, is capital loss. Issue 3. Master Charge Expenses
FINDINGS OF FACT The success of petitioner's large and prosperous construction business depended on securing contracts from builders of apartment complexes. Most of petitioner's clients were from out-of-state. Petitioner spent a good deal of time and money entertaining both current and prospective clients in connection with *75 maintaining and securing valuable construction contracts. In addition, petitioner spent time with clients reviewing construction plans and inspecting completed projects. Petitioner also travelled in connection with his business. Petitioner paid for most of his travel and entertainment expenses with a Master Charge credit card. Other expenses charged to Master Charge included expenditures for gasoline and auto repair, construction materials, office supplies, and personal items. Petitioner kept no contemporaneous record such as an account book, diary, or similar record of any expense incurred in 1974 or 1975. Nor did petitioner make any statement at trial recalling the identity of any of his business guests or indicating the business purpose of any travel or entertainment. The accounting procedure at petitioner's office was to make an allocation of all Master Charge expenses and to give the bookkeeper a breakdown of all such expenses into certain categories such as: automobile, travel and entertainment, construction materials, office supplies, and personal expenses. For 1974 petitioner claimed $ 5,599.36 in travel and entertainment expenses. The same procedure was not followed *76 in 1975. Dur to a change in personnel, petitioner's CPA, Knapp, was retained to file the 1975 return. Unfamiliar with the existing procedure, Knapp mistakenly deducted, as "travel" expenses, all 1975 Master Charge expenses of $ 16,759.29 without a breakdown into separate categories. Subsequently, petitioner and Knapp reviewed the 1975 Master Charge statements and made the following expense allocations: Category
Amount
Automobile
$ 3,197.22
Travel and Entertainment
2,729.75
Construction Materials
1,937.19
Office Supplies
1,042.74
Personal
6,598.56
Finance Charges
131.09
Total
[3] $ 15,636.55
In his notice of deficiency, respondent disallowed the entire $ 5,599.36 claimed as travel and entertainment expenses for 1974. In a separate notice of deficiency, respondent disallowed the entire amount, $ 16,759.29, of "travel" expenses claimed for 1975. [4] Petitioners concede those 1975 expenses allocated to personal items, $ 6,598.56, *77 are not deductible. OPINION Respondent contends that travel and entertainment expenses deducted in 1974 and 1975 in the amounts of $ 5,559.36 and $ 2,729.75, respectively, are nondeductible under section 274(d) for lack of substantiation. We must sustain respondent's contention.
Section 274(d) and the regulations thereunder provide that no deduction is allowable for travel and entertainment unless the expense is adequately substantiated. For both travel and entertainment expenses, the taxpayer must show the amount, time, place, and business purpose involved while the business *78 relationship with the guest must also be established to substantiate entertainment expenses. Sec. 1.274-5(b)(2) and (3), Income Tax Regs. Furthermore, substantiation of each and every one of these elements by "adequate records" or by "sufficient evidence corroborating the taxpayer's own statement" is required. Sec. 1.274-5(c)(1), Income Tax Regs.
Petitioner put into evidence copies of all Master Charge statements for the years 1974 and 1975. Petitioner did not maintain contemporaneous records of his expenditures, not did petitioner either identify a single business guest or indicate the business purpose of any meeting. In effect, petitioner relies on the Master Charge statements alone to substantiate the travel and entertainment expenses. Petitioner gave no reason for his lack of recordkeeping other than a general dislike for keeping records. With regard to the entertainment expenses claimed, a Master Charge statement is inadequate to substantiate either the business purpose or business relationship with the gueat entertained. Although a general business *79 purpose can be inferred from the nature of petitioner's construction business, the business purpose must be stated with specificity. Sec. 1.274-5(c)(3), Income Tax Regs. Petitioner came forward with no such specific evidence. In addition, the business relationship with the guest must be established, and such relationship is not established unless the taxpayer supplies the identity of his gueat--either by name, title, or other sufficient designation. Sec. 1.274-5(b)(3)(v), Income Tax Regs. Petitioner did not supply the identity of any of the business guests entertained.
As far as travel expenses are concerned, the regulations require substantiation of the time (e.g., dates of departure and return), place, and business reason for the travel. Sec. 1.274-5(b)(2), Income Tax Regs. Again, petitioner relies only on the Master Charge statements without introducing additional evidence detailing the time, place, or business reason for any travel. [5] We conclude that all travel as well as entertainment expenses claimed *80 as a deduction for 1974 and 1975 are disallowed in their entirety for lack of substantiation under section 274(d). Petitioners' breakdown of Master Charge expenses includes $ 1,937.22 [6] for construction materials and $ 1,042.74 for office supplies in 1975. There is no dispute that those amounts were in fact paid and respondent does not seriously dispute the amounts petitioners allocated to each category. Respondent makes the bare assertion, however, that those expenses were not incurred for a business purpose. We have no reason to doubt petitioners. We are satisfied petitioners' allocations here are proper, and those figures represent ordinary and necessary expenses incurred in petitioner's business and are therefore deductible in 1975 under section 162. Petitioners allocated $ 3,197.22 of the total Master Charge expenses for 1975 *81 to automobile business expenses for local transportation. The majority of such automobile expenses were for gasoline and auto supplies. We are convinced that a large portion of those expenses were incurred in direct connection with petitioner's construction business. Other automobile expenses were personal in nature. Applying the Cohan rule, we hold that $ 2,500 fairly represents the amount of such automobile expenses deductible as business expenses in 1975. See Cohan v. Commissioner, 39 F.2d 540, 544 (2d Cir. 1930). Respondent asserts that the finance charges of $ 131.09 paid by petitioner to Master Charge in 1975 are not deductible. Respondent's contention is that those finance charges were deducted as interest on another part of petitioners' 1975 income tax return. In his notice of deficiency, respondent determined the entire amount of Master Charge expenses are not deductible either because they are not ordinary and necessary business expenses or because they are not adequately substantiated. Respondent did not determine that such Master Charge expenses were also claimed as a deduction elsewhere on petitioners' 1975 income tax return. In addition, *82 no similar claim was raised in the pleadings. Petitioner then came forward with a breakdown of those expenses into different categories, including finance charges. At trial petitioners established that those finance charges were in fact paid. Respondent did not challenge this fact; instead, he completely ignored the subject of finance charges at trial. Only on brief does respondent raise the issue that those finance charges were deducted as interest on another part of petitioners' 1975 income tax return. This question was not at issue at or before trial, and it is apparent petitioners were unaware of it.
An issue cannot be raised for the first time after trial when to do so prevents the opposing party from presenting evidence he could have introduced if the issue had been timely raised. See Fox Chevrolet, Inc. v. Commissioner, 76 T.C. 708, 733-736 (1981); Theatre Concessions, Inc. v. Commissioner, 29 T.C. 754, 760-761 (1958). [7] This is particularly true where, as here, petitioners would be surprised and substantially disadvantaged by the delay in *83 raising the issue. If petitioners had been adequately apprised of respondent's claim, they would at least have been in a position to show such Master Charge expenses were not, in fact, deducted as interest on another part of the return. However, the trial is over and petitioners are helpless to remedy their position. For this reason we think it would be inappropriate to consider this issue. Accordingly, we find petitioners are entitled to a deduction for finance charges paid and we refuse to consider respondent's contention that those finance charges were deducted twice. Issue 4. Automobile Expense
FINDINGS OF FACT Petitioner operated a Cadillac El Dorado and an Excalibur in connection with his construction business. He referred to the El Dorado as his "field" car, in that it stayed muddy on the outside and dirty on the inside. The "field" car was used to visit job sites and, thus, was often driven on poor roads. For better performance, the "field" car was equipped with front wheel drive and a business telephone. Petitioner referred to the Excalibur as his "customer" *84 car. His "customer" car was kept clean. Petitioner used the "customer" car to take business clients to job sites, to visit construction jobs already completed by petitioner, to pick up clients at the airport, and to provide transportation for entertaining both current and prospective clients. Petitioner infrequently used either the "field" or "customer" car for personal reasons. In addition to the two vehicles described above, petitioner owned at least seven other cars during 1974 and 1975, two of which, a Mercury and an El Camino, were used by employees of petitioner's construction business in connection with their supervisory duties. The other five cars owned by petitioner were a Corvette, a Pantera, two Street Rods, [8] and a Lincoln Continental Mark IV purchased in December 1975. Petitioner also owned two motorcycles.In addition, petitioner's wife, whom he married in 1975, owned her own car. Petitioners claimed depreciation deductions on the El Dorado and Excalibur of $ 7,858.50 *85 and $ 4,966.26 for 1974 and 1975, respectively. Petitioners also claimed deductions for insurance premiums on those two cars of $ 438.00 for each year, 1974 and 1975. In his notice of deficiency, respondent determined petitioners are not entitled to deduct depreciation and insurance expenses associated with the operation of those two vehicls in 1974 and 1975. OPINION The issue is the extent to which petitioner used the El Dorado and Excalibur for business purposes.
Section 162 allows a taxpayer to deduct the ordinary and necessary expenses of conducting a business. Conversely, section 262 provides no deduction shall be allowed for personal expenses. When the acquisition nnd maintenance of property such as an automobile is primarily associated with profitmotivated purposes, and personal use can be said to be distinctly secondary and incidental, a deduction or maintenance expenses and depreciation will be permitted. International Artists, Ltd. v. Commissioner, 55 T.C. 94, 104 (1970). Respondent's only argument is that petitioners have failed to established the amount *86 of business usage of the two cars.Respondent is particularly troubled by the fact that petitioner must have used the business cars for personal reasons at some point in time. We are convinced that any personal use of the two cars was merely incidental to the primary businss use of those vehicles. Each vehicle served a distinct businss purpose. The "field" car was used and equipped by petitioners to drive to and from job sites. When clients were involved, the "customer" car substituted for the "field" car and served as the transporting vehicle. Petitioner owned five other cars and two motorcycles which adequately served his personal needs. In addition petitioner's wife drove her own car. We conclude petitioners are entitled to deduct all depreciation and insurance expenses with respect to the El Dorado and Excalibur, in 1974 and 1975. Issue 5. Embezzlement Loss
FINDINGS OF FACT In 1975 petitioner discovered that his secretary, Mrs. Jones (hereinafter Jones), embezzled funds of his business. Jones caused checks drawn on business bank accounts to be made payable to "cash" and then forged petitioner's signature. Those checks were then cashed by Jones who used the money *87 for her personal benefit. When those checks returned from the bank, Jones replaced "cash" with the name of another payee and then charged those checks to various company expense accounts. Jones ceased to be petitioner's employee in September 1975. She was replaced by Janet Norris (Norris) in early October 1975. When the first bank statement returned after Norris was hired, Noris discovered petitioner's signature had been forged on certain checks. Norris immediately notified petitioner and his attorney. After going over the records, petitioner discovered at least $ 6,054 in funds which had been diverted by Jones by Forgery. Petitioner knew Jones well. She was over 50 years old and a widow. Petitioner knew she had no funds or assets from which he could recover his loss. When she worked for petitioner as his secretary, petitioner had often loaned her money and advanced her salary checks. Over a year after discovering the wrongdoings, petitioner, against the advice of his attorney, brought suit against Jones and the drawee bank in March 1977 to recover his loss. Petitioner instituted that suit because he was upset that a trusted employee, who had been treated very well, *88 had taken advantage of him. The suit was dismissed by petitioner in 1978. On their 1975 joint Federal income tax return, petitioners deducted, as a part of their business expenses, $ 6,054 in embezzlement losses. In his notice of deficiency, respondent determined petitioners are not entitled to deduct those embezzlement losses. OPINION The issue is whether 1975 is the proper year for deducting the embezzlement loss.
Section 165(a) allows a deduction for any loss sustained during the taxable year. Section 165(e) treats any loss arising from theft as sustained during the taxable year in which the taxpayer discovers such loss. The loss is not sustained for purposes of section 165 if there existed a "claim for reimbursement with respect to which there * * * [was] a reasonable prospect of recovery." Secs. 1.165-1(d)(3) and 1.165-8(a)(2), Income Tax Regs.Section 1.165-8(d), Income Tax Regs., provides theft losses include embezzlement losses. There is no dispute that there was, in fact, an embezzlement loss of $ 6,054.Respondent contends that such *89 loss is not deductible in 1975 since, in 1975, there remained a reasonable prospect of recovering such loss and, therefore, the deduction should be postponed to a later year. Respondent asserts that petitioner's suit, instituted in 1977 to recover the loss, precludes any deduction for such loss in 1975.
Litigation with respect to a loss does not, however, invariably postpone the deduction. [9] The regulations explicitly provide: Whether a reasonable prospect of recovery exists with respect to a claim for reimbursement of a loss is a question of fact to be determined upon an examination of all facts and circumstances * * *. [Sec. 1.165-1(d)(2)(i), Income Tax Regs.] The test to be applied in determining the year in which a loss is to be deducted is a practical, not a legal test. Boehm v. Commissioner, 326 U.S. 287, 293 (1945); Lucas v. American Code Co., 280 U.S. 445, 449 (1930). *90 Soon after he hired a new secretary, petitioner discovered the defalcations of his prior secretary, Jones. Petitioner knew the financial condition of Jones. She was over 50 years old and widowed. Petitioner often loaned Jones money or advanced her salary checks while she was an employee of petitioner. Petitioner knew Jones had no assets or funds from which he could recover his loss. Over a year after discovering the embezzlement, petitioner filed suit against Jones and the drawee bank to recover the loss. The suit was filed not with any real hope of recovery, but primarily out of emotion and the anger petitioner felt at being bilked by a trusted employee. Indeed, the same suit was dismissed thereafter by petitioner. Based on the entire record in this case, we are convinced that, as a practical matter, petitioner had no reasonable prospect of recovering his loss from his secretary with whom he misplaced his trust. Respondent also contends that petitioner had a claim against the bank for paying over forged signatures and, thus, petitioner had a reasonable prospect of recovery in 1975. Petitioner claims he was precluded from recovering against the bank because he did not *91 discover the forgeries and notify the bank within 14 days after receiving his bank statements, as required under section 47-4-406, Tenn. Code Ann. Under the provision of section 47-4-406, Tenn. Code Ann. subsection 2(b), a depositor is precluded by failure to examine the checks within 14 days from asserting liability against the bank on account of unauthorized signature. Jackson v. First National Bank of Memphis, Inc., 55 Tenn. App. 545; 403 S.W.2d 109, 113 (1966). Only after the change of employees, did petitioner discover the prior wrongdoing of his previous secretary. However, petitioner received bank statements with the forged checks long before, at least more than 14 days before, their discovery. Petitioner simply failed to examine those bank statements. Thus, under Tennessee law petitioner was precluded from recovering against the bank. Section 47-4-406-2(b), Tenn. Code Ann., precludes any recovery by petitioner against the bank since reasonable care in examining his bank statements would have disclosed the unauthorized signatures and petitioner failed to notify the bank within 14 days after he received the first bank statement with forged *92 checks. Petitioner understood his chance of recovery was almost nonexistent. He filed the suit against the advice of his attorney and, indeed, the suit was thereafter dismissed by petitioner. In summary, we find petitioner had no reasonable prospect of recovering his loss in 1975 from either his secretary or the bank. We hold petitioners are not required to postpone the deduction for the embezzlement loss to a later year. To reflect the foregoing, Decisions will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in issue.↩
2. See also Rev. Rul. 66-93, 1966-1 C.B. 165↩.
3. This figure is less than the $ 16,759.29 deducted on the return because of beginning payments to Master Charge which do not represent actual charges for 1975. Petitioners have conceded this difference is not deductible.↩
4. Respondent also determined in his notice of deficiency that $ 1,010.26 of construction materials claimed on another part of the 1975 return under Schedule C-1 as business expenses are not deductible in 1975. Petitioners stipulate this expense was paid with Master Charge. It is apparent that this amount has been deducted twice on petitioners' 1975 return, once as "travel" expense and once more as a Schedule C-1 business expense. This expense is allowable as a deduction only once. See n. 6, infra↩.
5. Petitioners introduced one car rental receipt from Hertz in the amount of $ 40.66. However, the business purpose of that rental has not been established; therefore, no deduction is allowed.↩
6. Included in the $ 1,937.22 expended for construction materials is $ 1,010.26 claimed by petitioners under Schedule C-1. See n. 4, supra↩.
7. See also Estate of Stubblefield v. Commissioner, T.C. Memo. 1981-353↩.
8. The Street Rods were described as 1931 and 1932 Ford models built with modern accessories such as a Corvette engine, chrome headers, chrome rear end, leather interior and bucket seats.↩
9. See also Greaves v. Commissioner, T.C. Memo. 1980-535; Condit v. Commissioner, T.C. Memo. 1980-536↩.