**VENDING CHATTANOOGA, INC.,**
Plaintiff-Appellee,

v.

**AMERICAN NATIONAL BANK AND TRUST COMPANY,**
Defendant-Appellant.

Supreme Court of Tennessee,
at Knoxville.

May 11, 1987.

John W. Murrey, III, Kenneth C. Beckman, Witt, Gaither and Whitaker, Stephen Gilmore, Chattanooga, for defendant-appellant.

David B. Kesler, Brown Dobson Burnette & Kesler, Chattanooga, for plaintiff-appellee.

## OPINION

RICHARD E. LADD, Special Justice.

This is a suit between a bank, American National Bank and Trust Company, and its customer, Vending Chattanooga, Inc. The ultimate issue is which party will be responsible for the loss as the result of some forty forged checks drawn on the customer's account over a twelve month period, involving a total amount of $20,950. Both the Chancellor and the Court of Appeals held that the appellant bank was responsible for the entire loss. We reverse and remand for further proceedings.

The plaintiff, Vending Chattanooga, Inc., is a small corporation engaged in the vending machine business in the Tri-State area around Chattanooga, and did its banking business with the defendant, American National Bank and Trust Company. At the time in question, December 1982, through December 1983, the office staff of the plaintiff consisted of the owner, Mr. Robert J. Berman, and the office manager, Mrs. Linda Gilliland. Mrs. Gilliland had been hired by the plaintiff in 1979, and had proved to be a trusted and reliable employee over the previous four years of her employment.

Sometime after hiring Mrs. Gilliland in 1979, Mr. Berman sought to reduce expenses by having an in-house bookkeeper rather than paying his CPA firm to do the routine bookkeeping work. After a discussion with Mrs. Gilliland, Mr. Berman hired her husband, Mr. Llewllyn Gilliland to do the plaintiff's bookkeeping on a part time basis. Mr. Gilliland's duties consisted of posting sales and expense accounts, preparing depreciation statements, and expense and revenue statements, which were then turned over to the CPA firm. However, Mr. Gilliland's duties did not include the handling of corporate checks.

It was the duty of Mrs. Gilliland, as office manager, to keep the checkbook and to prepare checks for Mr. Berman's signature for payment of the expenses of the plaintiff. It was also her responsibility to reconcile the monthly bank statement, initial and date it to indicate it had been checked, and then to turn it over to Mr. Berman for his review. During the period of December 1982, through December 1983, Mr. Gilliland obtained possession of blank company checks and drew some forty checks made payable to himself, forged the name of Mr. Berman, the only authorized signatory for the customer, and then cashed the checks at various branches of the defendant bank. The checks were pre-numbered, but Mr. Gilliland used checks out of sequence, (much higher numbers), than the ones being currently used by plaintiff. The total sum of the checks forged, cashed and charged to the company account was $20,950. The proof is uncontroverted that the bank mailed to the plaintiff monthly statements along with cancelled checks. Sometime prior to December 1982, Mrs. Gilliland began turning the bank statements and cancelled checks over to her husband to reconcile. She would initial and date the statements before turning them over to Mr. Berman. Under the facts as found by the trial court and the Court of Appeals, Mr. Berman had no knowledge that Mrs. Gilliland had delegated the reconciliation of the bank statement to her husband. The proof also showed that Mr. Gilliland would remove the forged checks from the bank statements before turning them over to his wife for delivery to Mr. Berman. The customer first notified the bank of possible forgeries on January 2, 1984.

This lawsuit was filed after the bank refused to reimburse the customer in full for monies paid out of the plaintiff's account on the forged checks.

In a forgery case, we start with the basic premise and rule of law that between the customer and the bank, the bank must bear the loss where monies have been paid out

due to a third party forging the customer's signature on a check. Tenn.Code Ann. § 47–3–401(1), provides "No person is liable on an instrument unless his signature appears thereon." The signature of the drawer is one of the essential elements to the validity of a check and the general rule is the bank must know the genuineness of the depositor's signature. *American National Bank v. Miles*, 18 Tenn.App. 440, 79 S.W.2d 47 (1935).

An exception to this general rule is contained in TCA § 47–4–406, which, as pertinent here provides:

Customer's duty to discover and report unauthorized signature or alteration.— (1) When a bank sends to its customer a statement of account accompanied by items paid in good faith in support of the debit entries or holds the statement and items pursuant to a request or instructions of its customer or otherwise in a reasonable manner makes the statement and items available to the customer, the customer must exercise reasonable care and promptness to examine the statement and items to discover his unauthorized signature or any alteration on an item and must notify the bank promptly after discovery thereof.

(2) If the bank establishes that the customer failed with respect to an item to comply with the duties imposed on the customer by subsection (1) the customer is precluded from asserting against the bank:

(a) his unauthorized signature or any alteration on the item if the bank also establishes that it suffered a loss by reason of such failure; and

(b) an unauthorized signature or alteration by the same wrongdoer on any other item paid in good faith by the bank after the first item and statement was available to the customer for a reasonable period not exceeding fourteen (14) calendar days and before the bank receives notification from the customer of any such unauthorized signature or alteration.

(3) The preclusion under subsection (2) does not apply if the customer establish-

es lack of ordinary care on the part of the bank in paying the item(s).

The appellant bank contends that the trial court and the Court of Appeals were in error in the application of the facts of this case to the law as contained in TCA § 47–4–406, in that: (1) plaintiff, Vending Chattanooga, Inc., did not exercise reasonable care to examine its bank statement and the enclosed checks in order to discover the unauthorized signatures of its president on the forged checks, and failed to report the forgeries to the bank as required by law; and (2) the bank exercised ordinary care in honoring the checks bearing the forged signatures.

All forty checks involved "an unauthorized signature or alteration of the same wrongdoer," and thus the special provision of subsection (2)(b) of TCA § 47–4–406 comes into play. Thus, if the customer is found not to have exercised reasonable care in examining the bank statements, the bank would not be liable for forgeries paid after the first forged check and statement was available to the customer for a reasonable period not exceeding fourteen calendar days before the bank receives notification from the customer of the forgery.

The bank "sends" the bank statement to the customer when the statement is deposited in the mail with postage and properly addressed to customer. TCA § 47–1–201(38).

Both the trial court and the Court of Appeals primarily reached their decisions based on the case of *Jackson v. First National Bank of Memphis, Inc.*, 55 Tenn. App. 545, 403 S.W.2d 109 (1966). The *Jackson* case involved both a unique and interesting set of facts. The lawsuit involved the forgery of fifty checks from August 1963, to August 1964, on the checking account of Greater St. Matthews Church. The church's account required the signature of both Cleve Jordan, financial secretary and Milton Jackson, senior trustee, before the checks would be honored by the bank. The account also specified that statements and cancelled checks were to be mailed to Cleve Jordan, financial secretary. During the period in question, Mr. Jordan

drew fifty checks payable to himself, and forged the signature of Mr. Jackson, Trustee. Many of the checks bore the endorsement of a dog racing track in Arkansas, across the Mississippi River from Memphis. The financial secretary, Mr. Jordan, had been a faithful and trusted member of the church, and one of its officers for about twenty years. Since the Uniform Commercial Code did not become effective in Tennessee until July 1, 1964, the *Jackson* case first discussed the Uniform Negotiable Instruments law, but, as to those checks involved after July 1, 1964, then held that two sections of the Uniform Commercial Code, applied, namely, TCA § 47–3–406, and § 47–4–406.

> TCA § 47–3–406 provides as follows:
> Negligence contributing to alteration or unauthorized signature.—
> Any person who by his negligence substantially contributes to a material alteration of the instrument or to the making of an unauthorized signature is precluded from asserting the alteration or lack of authority against a holder in due course or against a drawee or other payor who pays the instrument in good faith and in accordance with the reasonable commercial standards of the drawee's or payor's business.

Both the *Jackson* case and the Court of Appeals in the instant case held that the plaintiff customer would not be prevented from recovering its losses because of § 3–406 of the Uniform Commercial Code. We agree with the *Jackson* case and the Court of Appeals, but it is important to note that TCA § 47–3–406, applies to acts of the customer before the forgery and not acts afterwards in discovering the forgery. Thus, the customer who has a trusted, loyal employee, and delegates to that employee the duties of holding the checkbook and writing the checks, and has no reason to believe the employee is dishonest or disloyal, would not ordinarily be negligent if, through the acts of that employee, certain forgeries took place.

However, UCC § 4–406, has a completely different purpose, namely, to judge the negligence of the customer after the forgeries, and the acts of the customer in discovering the forgeries. Under TCA § 47–4–406(1) "... the customer must exercise reasonable care and promptness to examine the statement and items to discover his unauthorized signature ... and must notify the bank promptly after discovery thereof." The burden of proof is placed on the bank to prove the customer's lack of reasonable care.

The *Jackson* case held that since Mr. Jordan had been a faithful and trusted member of the church and one of its officers for about twenty years, the church could not be held guilty of negligence in employing an unfaithful agent. We disagree. It is a basic rule of agency that the principal is liable for the negligent acts of its agents, while acting as agent for the principal. As stated by the Superior Court of New Jersey:

> ... A clerk is not the agent of his principal in the commission of a forgery, and his knowledge can not be imputed to the principal, but, after forged checks have been paid and returned to the depositor as vouchers, along with his account written up and balanced according to usual business methods, if the depositor assigns the duty of examining such vouchers and account to the same clerk, who has had an opportunity of committing a fraud and has done so, then such clerk, in the discharge of his duty, is the agent of the depositor, and the latter is chargeable with his agent's knowledge of the fraud. *Rainbow Inn, Inc., v. Clayton National Bank*, 86 N.J.Super. 13, 205 A.2d 753 (Appellate Division) 1964.

We hold the rule in evaluating a customer's exercise of reasonable care under TCA § 47–4–406, to be as follows: "... a depositor must be held chargeable with knowledge of all the facts that a reasonable and prudent examination of the returned bank statements would have disclosed had it been made by a person on the depositor's behalf who had not participated in the forgeries." J. White and R. Summers, *Uniform Commercial Code*, 2nd Edition, (1980) § 16–7, page 630. We over-

rule any contrary finding in the *Jackson* case.

■ Applying the above rule to the facts of the instant case, we find that the customer, Vending Chattanooga, Inc., through its agent Mrs. Gilliland, violated its duty to exercise reasonable care and promptness in discovering the forgeries, and thus was negligent as defined under TCA § 47–4–406.

The December 1982 bank statement contained two checks payable to Mr. Gilliland, namely, check number 6299 dated December 15, 1982, in the amount of $600.00 and check number 6300, dated December 15, 1982, in the amount of $600.00. Mr. Gilliland's income as in-house bookkeeper ranged from $50.00 to $100.00 a month. A reasonable and prudent examination of the December 1982 bank statement, with cancelled checks, would have disclosed these two out-of-sequence checks, which were in amounts of at least six times Mr. Gilliland's normal pay. These two facts would have alerted a reasonable and prudent examiner to discuss the matter with Mr. Berman and would have resulted in a discovery of the forgeries. Apparently, the next forgery did not occur until check number 6922 on March 2, 1983.

We also hold that this negligence by the customer was a proximate cause of the bank honoring the forged checks as defined under TCA § 47–4–406. Thus, plaintiff customer would be precluded from asserting against the bank those forged checks received and paid by the bank within a reasonable time (not to exceed fourteen days) after the bank had sent the first monthly statement to the customer with any forgeries.

However, TCA § 47–4–406 further provides "(3) the preclusion under sub-section (2) does not apply if the customer establishes lack of ordinary care on the part of the bank in paying the item(s)."

■ Thus, as stated by Professors White and Summers, "... of course negligence does not travel without its companion, contributory negligence and if both the customer and his bank are negligent, the two will usually offset one another and reopen the customer's claim on the forgery." J. White and R. Summers, *Supra,* p. 607. The burden of proof is placed on the customer to establish the negligence of the bank. In evaluating the duty of the bank, the *Jackson* case holds that the bank must closely examine the signature on each check with the signature card, and holds the failure to do so establishes lack of ordinary care on the part of the bank. In effect, it requires the bank employees to be handwriting experts and make a value judgment as to the authenticity of the signature on each check that is processed. The Chancellor and the Court of Appeals were compelled to follow the *Jackson* decision and in the instant case found the bank was negligent in failing to closely compare the signature of each forged check with the signature card. We disagree that the duty of ordinary care on the bank is so severe and exact, and overrule the holding in the *Jackson* case. To follow such a rule would place the bank in an impossible situation of either: (1) being an insuror of all forgeries regardless of the lack of the customers reasonable care; or (2) require the bank to hire such a large number of skilled handwriting experts so as to be economically not feasible, and certainly not commercially reasonable. We do not believe such a rule would be compatible with the intent of the Uniform Commercial Code, and in practical effect § 4–406, would be useless. What then, is "ordinary care" on the part of a bank? We hold that a bank exercises ordinary care when it pays a check in good faith and in accordance with the reasonable commercial standards of the banking industry. Such a rule does not require the bank to be a handwriting expert on the signature of each check, and on the other extreme a bank would be negligent in honoring a check with no signature at all. Application of the rule between these two extremes would depend on the facts in each case and what the facts showed to be a reasonable commercial standard of the banking industry.

Such a general rule seems to be compatible with the intent of the authors of the

Uniform Commercial Code. TCA § 47–4–103, provides in part:

> ... (3) Action or nonaction approved by this chapter or pursuant to federal reserve regulations or operating letters constitutes the exercise of ordinary care and, in the absence of special instructions, action or nonaction consistent with clearinghouse rules and the like or with a *general banking usage* not disapproved by this chapter, prima facie constitutes the exercise of ordinary care. [emphasis added]

The authors of the Uniform Commercial Code state:

> The term "ordinary care" is not defined and is here used with its normal tort meaning and not in any special sense relating to bank collections.

> \*   \*   \*   ⁂   \*   \*

> The term "general banking usage" is not defined but should be taken to mean a general usage common to banks in the area concerned. Where the adjective "general" is used, the intention is to require a usage broader than a mere practice between two or three banks but it is not intended to require anything as broad as a country-wide usage. A usage followed generally throughout a state, a substantial portion of the state, a metropolitan area or the like would be certainly sufficient. TCA § 47–4–103, Comments to Official Text, Note 4.

The authors of the UCC go on in Note 4 to clarify that the ultimate power to determine "ordinary care" is conferred on the courts, but state: "The prima facie rule does, however, impose on the party contesting the standards to establish that they are unreasonable, arbitrary or unfair."

Likewise, TCA § 47–4–406(3), expressly places the burden of proof on the customer to establish lack of ordinary care on the part of the bank.

█ Before applying the rule of the *Jackson* case, the Chancellor in effect held that American National Bank followed "customary banking practices" and "rules and regulations" of banks similar to the defendant bank. In dealing with the Chancellor's findings, the Court of Appeals stated, "Prosser, *Law of Torts* 167 (1971), states, 'even an entire industry, by adopting such careless methods to save time, effort or money, cannot be permitted to set its own uncontrolled standard.'" We agree with the statement of the law, but find no evidence in the record to rebut the reasonable commercial standard of the banking industry as shown by the proof of the defendant. The burden would be on the plaintiff to show that the methods of the banking industry was so careless as to show the lack of ordinary care on all banks.

In addition, the burden would be on the customer to prove that the negligence of the bank was the proximate cause of the losses in the payment of the item or items in question.

Thus, the customer might prove that a bank was negligent, and that that negligence was the proximate cause of the bank paying one forged check. However, that negligence may or may not be the proximate cause of the bank paying other forged checks by the same wrongdoer depending on the facts of the individual case.

In summary, if the proof in the case showed that both the customer and the bank were negligent under the standards of TCA § 47–4–406, and the rules defined above, and that the negligence of the customer and the bank combined and concurred together as the proximate cause of the bank's payment of the forgeries, then, of course, the bank must bear the loss of the forgeries. No comparative fault exists under the Code.

In summary, we find as follows:

(1) the trial court and the Court of Appeals are reversed in their findings for the plaintiff;

(2) *Jackson v. First National Bank of Memphis, Inc.*, 55 Tenn.App. 545, 403 S.W.2d 109, 1966, is overruled in so far as its holdings differ from the holdings of this case;

(3) customer-plaintiff, Vending Chattanooga, Inc., failed to exercise reasonable care as defined under TCA § 47–4–406(1), and that this negligence on behalf of the

customer was a proximate cause of payment by the bank of forged checks after the two checks paid in December 1982. The other thirty-eight checks were all paid by the bank over fourteen days after the customer was sent the December 1982 statement and cancelled checks containing the first two forgeries;

(4) the cause is remanded to the trial court for a determination of the negligence, if any, of the bank and related proximate cause as defined by this opinion.

It would be neither fair nor just for this Court to attempt to determine the bank's negligence on this record, since the parties, the trial court, and the Court of Appeals, were all proceeding under the rules as set forth in the *Jackson* case.

The costs are taxed one-half to each party.

BROCK, C.J., and FONES, HARBISON and DROWOTA, JJ., concur.